## CAPEZIO v. CHICAGO THEATRICAL SHOE CO.

## SAME v. HARRIS.

### Nos. 5529, 5530.

Circuit Court of Appeals, Seventh Circuit.

Feb. 5, 1937.

Maxwell James, of New York City, and William F. Freudenreich, of Chicago, Ill., for appellant.

Benj. T. Roodhouse, Herman V. Silvertrust, and Otto M. Wermich, all of Chicago, Ill., for appellees.

Before EVANS, SPARKS, and ALSCHULER, Circuit Judges.

EVANS, Circuit Judge.

These appeals are from decrees entered in two separate suits dismissing the respective complaints which severally charged appellees with infringing appellant's patent No. 1,872,641, for "Ballet Slippers and Manufacture of Same." The decrees were predicated upon a finding of invalidity of the patent for lack of invention and novelty. The suits involve identical issues and were tried together. The decisions are therefore embodied in one opinion.

Appellees are manufacturers and retailers in theatrical footwear in Chicago. They are charged with infringement of appellant's patent which relates to the method of constructing a hard or box toe ballet slipper, and the resultant product. The art of making ballet slippers is an old one. This slipper is a turned shoe and is constructed upon a wooden last. Heretofore the process of making a ballet slipper was substantially as follows: The short leather sole is first tacked to the last and then the outer shoe material (in a nearly finished condition) is placed, inside out, upon the last, the satin facing being innermost. This covering, except for the front of the shoe, is stitched to the sole by machine. Thereafter extra pieces of cloth are laid on the front portion of the shoe and paste applied. The covering and filling are then drawn together at the front of the sole and tacks placed at the folds or plaits, and the shoemaker stitches by hand the bulky plaits into place. Sometimes a hammer is used to pound the plaits flat. While the paste is wet the shoe is removed from the last and turned. It is relasted and the inner sole inserted. The toe, or box, portion of the shoe becomes very hard when the paste dries. This boxed toe permits the dancer to stand on her toes.

The change which appellant asserts he disclosed for the first time by his patent is the *preshaping and preforming* of the slipper cover and *patterning* of each intermediate layer of cloth applied to form the box, so that all the cloth layers lie

flat and there are no plaits or wrinkles on the under side of the shoe inasmuch as there is no excess cloth to be tucked in. This permits the whole shoe to be machine sewn.

The patent also describes the insertion of a piece of leather, usually suede, covering only the face of the box toe and extending to the tip of the sole. The purpose of this piece is to give added durability at the points of greatest wear.

The patent in suit was issued August 16, 1932 on application filed April 18, 1930. There are thirty-four claims in the patent (sixteen product and eighteen process), and the complaints charge infringement of sixteen claims.

The specification describes one of the objects of the patent in this way:

"Another object of my invention is to increase the wear, and improve the appearance of a ballet slipper by avoiding bulges and plaits at the toe portion thereof regardless of the material of which the slipper is made, and to this end I have developed an entirely new technique in the manufacture of ballet slippers, in accordance with which, the material of the upper is patterned at the toe portion in order to obtain the desired shape without folds or plaits. Not only the upper, but also a filler, say thick elkskin, and toe stiffening members, and the inner lining of the slipper are all appropriately patterned to fit smoothly around the toe of the slipper without folds or plaits of any kind. This results in a trim slipper the shape of which is practically permanent for the life of the slipper."

We accept appellant's selection of the claims which are asserted to be more or less typical. They embody the novelty of the invention. Claim 34 represents the method claims and is as follows:

"In the manufacture of ballet slippers having an outsole terminating a substantial distance short of the toe of the slipper in the conventional manner, and leather wear resisting material on the toe and front sole portion thereof, the method which includes preliminarily patterning the fabric and leather materials of the upper at the toe and front sole portion of the slipper so as to obtain an enclosed or cupped toe shape which conforms to the toe without folds or plaits or like cause of excessive thickness, applying said upper materials to a last and there assembling the same with a short outsole, and then securing said outsole to the upper."

Claim 32 represents the product claims and is herewith set forth:

"A ballet or toe slipper comprising a leather outsole terminating a substantial distance short of the toe of the slipper, and an upper the toe portion of which is so cut or shaped as to obtain an enclosed or cupped toe shape without folds or plaits or like cause of excessive thickness, said upper being made of fabric but including leather wear resisting material secured to the fabric at the toe portion of the slipper and along the sole of the slipper at the forward end of the aforesaid short outsole, thereby forming leather wear resisting toe and sole portions which are in contiguous relation."

The craftsman in the ballet slipper art is engaged in making artistic as well as utilitarian products. His art is akin to that of the dressmaker and the boot and shoemaker. Attractiveness is much sought by some, comfort by others. Patentee sought to satisfy the trade and avoid the criticism to which the shoemaker is subjected, by bringing out a new slipper. For it he claims greater attractiveness, longer wear, and more comfort.

Appellees have interposed two defenses: (a) invalidity of the patent, and (b) non-infringement. The court found for appellant on the issue of infringement. He found appellant's slipper failed to disclose any patentable novelty over the prior art. Judge Barnes, in disposing of the case, said:

"These suits are for alleged infringement of Patent No. 1,872,641, issued August 16, 1932, to the plaintiff, Salvatore Capezio, for ballet slippers and the manufacture thereof. The claims of the patent relied upon are so-called method Claims 1, 3, 13 and 34 and ballet slipper Claims 16, 22, 26, and 32.

"The court is of the opinion that if the patent in suit is valid, it has been infringed by each of the defendants. As a matter of fact, the infringement is not seriously denied. The principal defense, and perhaps the only defense, is that of lack of invention,—lack of novelty in the disclosures of the patent.

"After a review of the entire case and a careful examination of the briefs of counsel, the court is of the opinion that this defense must prevail. The court is moved to this conclusion by a consideration of German Patent No. 420,613 to Dubble-

mann, the British Patent No. 252,850 of 1926 to Di Salvo, the 1924 Brooks slippers, the prior uses evidence in the Chamerlik slipper, the Helen Manning boot, and the practice of 'patching.' "

■ *Non-infringement.* The District Court found that infringement was "practically conceded." While appellees argue that their fillers are wrinkled and plaited and therefore do not infringe, we agree with the court that infringement is shown if the patent is upheld.

*Validity.* This brings us to the question of the validity of the patent which appellees assail on two grounds: (a) anticipation, and (b) non-invention—that is, the asserted novelty evidences merely mechanical skill.

What was the state of the ballet slipper art when Capezio brought out his slipper?

In the patent field there were the Dubbelmann German patent and the DiSalvo English patent. Both described in more or less detail the art of making ballet slippers and the changes each proposed. Also in the prior art, but not covered by patents, we find the Brooks slipper sold since 1926, the Chamerlik slipper, and the Helen Manning boot which was brought out in 1929.

It is apparent from a reading of the claims and the argument of appellant's counsel that the alleged novelty resides in (a) preforming the shoe covering and sewing it so that it is cupped shaped before it is put on the last for the first time; (b) patterning the intermediate layers so that they are flat when placed upon the cupped portion, whereas previously the filler element was not shaped and the excess material resulted in plaited slipper covers; (c) a tongue-shaped leather protector extending from the outer sole over the toe proper.

The Dubbelmann patent described the shape of the cloth pieces used in making the box, as successively smaller circular pieces of flexible cloth which fit around the last without creasing in a pyramidal formation as shown by him. A leather protective covering at points of wear is also described.

The DiSalvo patent described a tongue shaped toe and front protector of leather for ballet slippers. This strip is tucked on the bottom of the shoe under the sole, and at the top is marginally sewn.

The Helen Manning boot was constructed in 1929 by appellee, Harris. It is a "soft" boot in which the front portion of the toe is made by the insertion of a tongue shaped piece of leather at the front of the sole and sewed in the same as appellant's protective piece of leather. While this boot was ordered and made specially for a customer, the purchaser never called for it. It is significant as bearing on the question of patentability or invention.

The Brooks slipper is a plaited shoe, but has a leather tip sewn on top of the satin covering and caught in the plaits and stitched under the sole.

The Chamerlik slipper was made in the workroom of the appellee, Chicago Theatrical Shoe Co., by a former employee who made a dozen pairs of the slippers. His slipper bears an outward resemblance to the patented slipper inasmuch as there are inverted seams running upward from the sole, U-shaped, evidently made by clipping and seaming the excess filler and satin covering. Chamerlik did not use the leather toe cap. There are only a few very slight wrinkles, and no plaits, in the Chamerlik slipper.

■ We can not credit appellant with novelty in the use of the tongue shaped leather protector extending from the outer shoe over the toe proper. It was disclosed by DiSalvo and appeared in the Brooks slipper. We are also justified in assuming that a court may take judicial notice of the shoemaker's practice of patching. Appellant merely used the idea of a leather protecting layer and made it integral with the slipper.

■ The skill which the appellant displayed, if any, was devoted almost exclusively to efforts to avoid creasing or plaits. If there be invention in his slipper it must be traceable to his removal of plaits or creases from the toe of a ballet slipper.

The dressmaker patterns garments to make them fit the form. The task of the shoemaker was to pattern the fabric to make it fit a rounded toe. In the instant case he desired an avoidance of creases or plaits.

Appellees argue that plaits were long popular because they were considered decorative. They were consonant with the plaits in the skirts. They harmonized. We are not at all impressed by this argument. The plaits on the slipper were not

visible to the audience; they were too small to be noticeable; they were not so placed on the slipper as to be easily seen. Whatever may have been the reason for their popularity or vogue and long-continued use, their elimination was a simple matter for the shoemaker.

We agree with the District Judge that it was not the display of inventive genius to eliminate plaits or creases in slippers any more than it would have been for a dressmaker to take plaits from the skirt or other garments. In the shoemaker's art it necessitated cutting the pieces and eliminating the excess fabric before sewing. Putting any cloth garment around a body like the toe of a shoe last will result in wrinkles unless there is some cutting of the garment. We can not believe the adoption by Capezio of the practices so common in all other fields where smooth fitting, crease-eliminating results are desired, constituted invention. Atkins et al. v. Gordon, (C.C.A.) 86 F.(2d) 595, decided November 30, 1936.

The decrees are affirmed.